## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## GAINESVILLE DIVISION

**LARRY B. JOHNSON,**

 **Plaintiff,**

**vs.**         **Case No.  1:17cv248-MW/CAS**

**NANCY A. BERRYHILL,**
**Deputy Commissioner for Operations,**
**Social Security Administration,**

 **Defendant.**

_____/

## <u>REPORT AND RECOMMENDATION</u>

This is a Social Security case referred to the undersigned magistrate judge for a report and recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.2(D).  It is now before the Court pursuant to 42 U.S.C. § 405(g) for review of the final determination of the Deputy Commissioner (Commissioner) of the Social Security Administration (SSA) denying Plaintiff's application for Supplemental Security Income (SSI) filed pursuant to Title XVI of Social Security Act.  After consideration of the entire record, it is recommended that the decision of the Commissioner be affirmed.

## I. Procedural History

On August 6, 2013, Plaintiff, Larry B. Johnson, filed an application for SSI, alleging disability beginning January 1, 1995, based on paranoid schizophrenia, depression, suicidal attempts, very little reading and writing, and a disc removed from his neck.  Tr. 15, 87, 229.[1]  Plaintiff's application was denied initially on May 1, 2014, and upon reconsideration on December 5, 2014.  Tr. 15, 87, 111-22.  On January 21, 2015, Plaintiff requested a hearing.  Tr. 15.  The video hearing was held on December 22, 2016, before Administrative Law Judge (ALJ) Robert Droker presiding from Jacksonville, Florida, and Plaintiff appeared in Gainesville, Florida.  Tr. 15, 34-55.  Plaintiff was represented by Bradford D. Myler, an attorney, but appeared at the hearing with Bradley Howes, an attorney.  Tr. 15, 36, 60-62, 129-30, 193, 195-97.  Plaintiff testified during the hearing.  Tr.  37-51.  C. Kimball Heartsill, an impartial vocational expert, testified during the hearing.  Tr. 15, 51-54, 282-86 (Resume).

During the hearing, Exhibits 1A through 22F were received into evidence.  Tr. 29-33, 36.  On January 13, 2017, the ALJ issued a decision

---

[1]  Citations to the transcript/administrative record, ECF No. 15, shall be by the symbol "Tr." followed by a page number that appears in the lower right corner.

and denied Plaintiff's application for benefits concluding that Plaintiff was not disabled since August 6, 2013, the date the application was filed. Tr. 15-28.

On January 13, 2017, Plaintiff requested review by the Appeals Council of the ALJ's decision.  Tr. 196-97.  On February 14, 2017, the Appeals Council granted a request for more time to submit additional evidence.  Tr. 9.  On March 10, 2017, Plaintiff's counsel filed a brief with the Appeals Council.  Tr. 287-94.  On August 22, 2017, the Appeals Council noted that it had reviewed records submitted from Pennsylvania Psychiatric Instituted dated from May 15, 2013, to May 21, 2013 (seven pages), *see* Tr. 63-68 (three pages of medical records), and denied Plaintiff's request for review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-7; *see* 20 C.F.R. § 404.981.

On November 13, 2017, Plaintiff, by counsel, filed a Complaint with this Court seeking review of the ALJ's decision.  ECF No. 1.  The parties filed memoranda of law, ECF Nos. 17 and 18, which have been considered.

## II.  Findings of the ALJ

The ALJ made several findings:

1. "The claimant has not engaged in substantial gainful activity since August 6, 2013, the application date."  Tr. 17.

2. "The claimant has the following severe impairments: schizoaffective disorder, disorder of the spine, asthma, drug abuse and alcoholism, and attention deficit hyperactivity disorder (ADHD)."  Tr. 17.  The ALJ considered Plaintiff's non-severe knee impairment, noted medical evidence, and concluded this alleged impairment has been considered in formulating Plaintiff's residual functional capacity (RFC). Tr. 18.

3. "The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  Tr. 18.  For physical impairments, the ALJ considered Listings 1.00 and 3.00.  *Id.*  The ALJ noted that in September 2013, Plaintiff underwent an anterior cervical diskectomy and fusion and that he received conservative care following surgical intervention and physical examinations have been relatively remarkable.  *Id.* The ALJ also considered Listings 12.02, 12.03, 12.04, and 12.09 and the four broad functional areas set out in the disability regulations known as the "paragraph B" criteria and determined that Plaintiff had *moderate* restriction in activities of daily living; *moderate* difficulties social functioning, and concentration, persistence, or pace; and *no* episodes of decompensation that have been of *extended* duration.  The ALJ also considered whether the "paragraph C" criteria were satisfied and found they were not.  Tr. 18-20.  The ALJ noted, however, that the limitations identified in the "paragraph B" criteria are not an RFC assessment, but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process.  Tr. 20.

4. "[T]he claimant has the [RFC] to perform light work as defined in 20 CFR 416.967(b) with the following limitations: The claimant needs to avoid ladders or unprotected height.  He needs to avoid the operation of heavy moving machinery.  He needs to avoid concentrated dusts, fumes, or gases.  He needs a low stress work environment (that is, no production line).  He needs simple tasks. He needs to avoid contact with the public or coworkers; he needs tasks that do not require the assistance of others or require him to

assist others in the performance of their tasks.  He can occasionally bend, crouch, kneel, or stoop.  He needs to avoid squatting or crawling.  He needs to avoid the operation of foot controls."  Tr. 20.

5.  The claimant is unable to perform any past relevant work such as dining room attendant, medium exertion, unskilled with an SVP of 2.[2]  Tr. 26.

6.  The claimant was 43 years old, which is defined as a younger individual age 18-49, on the date the application was filed; has a limited education; and is able to communicate in English.  *Id.* "Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled."  Tr. 27.

7.  Considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that he can perform such as *blade balancer* and *bone*

---

[2] "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. § 416.968(a).  A Specific Vocational Preparation (SVP) of 1 means "short demonstration only." Dictionary of Occupational Titles (DOT) (4th ed., rev. 1991), Appendix C: Components of the Definition Trailer, § II, SVP.  An (SVP) of 2 means "[a]nything beyond short demonstration up to and including 1 month." *Id.* "[SVP] is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." *Id.* Unskilled work corresponds to an SVP of 1 and 2.  Social Security Ruling (SSR) 00-4p, 2000 SSR LEXIS 8, at *8 (Dec. 4, 2000).  Further, unskilled work is work involving understanding, remembering, and carrying out simple instructions; making simple work-related decision; dealing with changes in a routine work setting; and responding appropriately to supervision, co-workers, and usual work situations.  SSR 85-15, 1985 SSR LEXIS 20, at *10-11 (1985).  In part, "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 416.967(b).  "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledges, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 416.967(a).

*picker*, both light exertion, unskilled with an SVP of 2 and *table worker*, sedentary exertion, unskilled with an SVP of 2.  Tr. 27-28, 52-54; *see supra* at 5, n.2.  The ALJ explained:

> At the hearing, the vocational expert testified that an employee is permitted two fifteen minute breaks and a minimum 30-minute lunch break during the workday.  The vocational expert noted that employers tolerate no more than 10% off task behavior, and employers (sic) are allowed a maximum of two unscheduled absences per month after accrued time is exhausted.  The vocational expert utilized his expertise and years of experience in the job market when testifying on permitted breaks, off task behavior, and unscheduled absences.  Pursuant to SSR 00-4p, other testimony given by the vocational expert is consistent with the Dictionary of Occupational Titles.

Tr. 28; *see* Tr. 52-54.

8. "The claimant has not been under a disability, as defined in the Social Security Act, since August 6, 2013, the date the application was filed."  Tr. 28.

## III.  Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); *accord* Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The

Commissioner's factual findings are conclusive if supported by substantial evidence." Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002) (citations omitted).[3]

"In making an initial determination of disability, the examiner must consider four factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and corroborated by [other observers, including family members], and (4) the claimant's age, education, and work history.'" Bloodsworth, 703 F.2d at 1240 (citations omitted). A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). A disability is an "inability to engage

---

[3] "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted). "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ. A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. §§ 416.905(a), 416.909 (duration requirement).  Both the "impairment" and the "inability" must be expected to last not less than 12 months.  <u>Barnhart v. Walton</u>, 535 U.S. 212 (2002).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 416.920(a)(4)(i)-(v).

1. Is the individual currently engaged in substantial gainful activity?

2. Does the individual have any severe impairments?

3. Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4. Does the individual have the RFC to perform work despite limitations and are there any impairments which prevent past relevant work?[4]

---

[4]  An RFC is the most a claimant can still do despite limitations.  20 C.F.R. § 416.945(a)(1).  It is an assessment based upon all of the relevant evidence including the claimant's description of her limitations, observations by treating and examining physicians or other persons, and medical records.  *Id.*  Although an ALJ considers medical source opinions, the responsibility for determining claimant's RFC lies with the ALJ.  20 C.F.R. § 416.946(c); *see* SSR 96-5p, 1996 SSR LEXIS 2, at *12 (July 2, 1996) (rescinded eff. Mar. 27, 2017) ("The term "residual functional capacity assessment" describes an adjudicator's finding about the ability of an individual to perform work-related activities.  The assessment is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such

   5.   Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in

disapproval of the application for benefits.  A positive finding at step three

results in approval of the application for benefits.  At step four, the claimant

bears the burden of establishing a severe impairment that precludes the

performance of past relevant work.  Consideration is given to the

assessment of the claimant's RFC and the claimant's past relevant work.  If

the claimant can still do past relevant work, there will be a finding that the

claimant is not disabled.  If the claimant carries this burden, however, the

burden shifts to the Commissioner at step five to establish that despite the

claimant's impairments, the claimant is able to perform other work in the

national economy in light of the claimant's RFC, age, education, and work

experience.  Phillips, 357 F.3d at 1237; Jones v. Apfel, 190 F.3d 1224,

1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786

---

as observations of lay witnesses of an individual's apparent symptomatology, an
individual's own statement of what he or she is able or unable to do, and many other
factors that could help the adjudicator determine the most reasonable findings in light of
all the evidence."); *see also* Cooper v. Astrue, 373 F. App'x 961, 962 (11th Cir. 2010)
(unpublished) (explaining claimant's RFC determination "is within the province of the
ALJ, not a doctor").  (In this circuit, "[u]npublished opinions are not considered binding
precedent, but they may be cited as persuasive authority."  11th Cir. R. 36-2.)  The
Court will apply the SSR in effect when the ALJ rendered the decision.  *See generally*
Bagliere v. Colvin, No. 1**:**16CV109, 2017 U.S. Dist. LEXIS 8779, at *10-18, (M.D. N.C.
Jan. 23, 2017), *adopted*, 2017 U.S. Dist. LEXIS 51917 (M.D. N.C. Feb. 23, 2017).

F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. § 416.920(a)(4)(v), (f) & (g).

An ALJ may make this determination either by applying the grids or by

obtaining the testimony of a vocational expert.  <u>Phillips</u>, 357 F.3d at 1239-

40; *see* 20 C.F.R. pt. 404, subpt. P, app. 2.  If the Commissioner carries

this burden, the claimant must prove that he or she cannot perform the

work suggested by the Commissioner.  <u>Hale v. Bowen</u>, 831 F.2d 1007,

1011 (11th Cir. 1987).  Plaintiff bears the burden of proving that he is

disabled, and consequently, is responsible for producing evidence in

support of his claim.  *See* 20 C.F.R. § 416.912(a); <u>Moore</u>, 405 F.3d at

1211.

## IV.  Legal Analysis

**Substantial evidence supports the ALJ's evaluation of the medical evidence, including the consultative examination opinions of Dawn G. Crosson, Psy.D., and Ronald J. Karpf, Ph.D.**

I.

Plaintiff argues substantial evidence does not support the ALJ's

decision to give little weight to the opinions of Drs. Crosson and Karpf, who

provided one-time psychological consultative examination evaluations on

May 2, 2013, Tr. 541-44, and March 20, 2014, Tr. 649-53, respectively.

ECF No. 17 at 13-23; *see* Tr. 21-23.[5]  In support of this argument, Plaintiff

argues "the ALJ seemingly rejected both opinions for a *singular* reason:

that they were based on Plaintiff's subjective complaints, T 22-23," ECF

No. 17 at 15 (emphasis added), and "while the ALJ does provide other

reasons for rejecting Dr. Crosson's opinion, the stated reasons are poorly

cited and explained.  T 22," *id.* at 19.  Plaintiff also suggests Dr. Crosson

"had access and reviewed Plaintiff's medical health records of and to that

date.  T 542."  *Id.* at 17.  As for his evaluation of Dr. Karpf's opinion, Plaintiff

argues "the ALJ did not provide any other reasons apart from the

'subjective statement' analysis when rejecting the opinion.  T 23."  *Id.* at 19.

## II.

The ALJ began the RFC analysis with a discussion of Plaintiff's

hearing testimony.  Tr. 21; *see* Tr. 37-51.

> The claimant is 47 years of age and alleges an inability to work
> due to paranoia, schizophrenia, depression, suicidal attempts,
> very little reading and writing, and removal of disc from neck
> (Exhibit 2E/2) [Tr. 229].  The claimant noted that he has
> experienced body trembling since his neck surgery, and the
> claimant noted that his anxiety has gotten worse (Exhibit 9E/1)
> [Tr. 268].

---

[5]  On May 28, 2013, Dr. Crosson submitted a two-page check-off evaluation
indicating Plaintiff had *marked* restrictions in his ability to interact appropriately with the
public, supervisors, and co-workers and *extreme* restrictions in his ability to respond
appropriately to usual work situations and to changes in a routine work setting.  Tr. 529.
Dr. Crosson also noted that Plaintiff "has visual and auditory hallucinations that
command him to harm others and himself."  *Id.*

> At the hearing, the claimant testified that sometimes the psychotropic medication works; however, he will walk off a job due to auditory hallucinations and paranoia. The claimant testified that he has been on a new medication for two months. The claimant denied suicidal ideation, noting that the new medication helps a lot.
>
> The claimant testified that he was in special education in school due to learning--not a behavioral problem. In terms of a physical impairment, the claimant reported numbness on the left and an inability to stand or sit for long periods of time. The claimant testified that his lower back bothers him when sitting for too long. The claimant testified that he has issues with cartilage in both knees. The claimant testified. "I can't even walk a good mile." The claimant estimated that he is only able to lift and carry 5 pounds.
>
> The claimant testified that he last used illegal substances two years ago. The claimant noted that he used illegal drugs because he did not have medication. The claimant explained, "Now that I do have medication it helps me a whole lot better ..." [Tr. 51]

Tr. 21; *see* Tr. 37-51.

The ALJ noted Plaintiff has a history of substance abuse and mental symptomology, referring to medical records as early as 2007 and 2008. Tr. 21; *see* Tr. 295-433 (Exhibit 1F), 485-91 (Exhibit 4F), 654-69 (Exhibit 12F). The ALJ begins the discussion of Plaintiff's mental issues when on March 3, 2013, he presented to Pinnacle Health Harrisburg Campus (Pinnacle Health) for an evaluation for depression. Plaintiff had been hearing voices more frequently and had been having suicidal ideation, but reported no mental health treatment since his inpatient hospitalization in

December 2012, although he had stated he was compliant with medication. Tr. 512-17; *see* below for additional discussion.

Plaintiff begins a discussion of the relevant medical evidence with Plaintiff's hospitalization for mental health issues in May 2008. Tr. 305. The admitting diagnosis was psychosis R/O schizophrenia. *Id.* He was diagnosed with schizoaffective disorder bipolar type, depressed, as well as borderline personality disorder. *Id.* In November 2, 2012, Plaintiff was discharged from T.W. Ponessa & Associates Counseling Services, Inc., because he returned to New Jersey. Tr. 487. While in therapy, Plaintiff reported depression and anxiety, a decreased need for sleep, feeling of sadness, among other considerations. Tr. 490. Upon discharge, he was assigned a Global Assessment of Functioning (GAF) score of 50.[6] Tr. 489.

---

[6] The American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) (4th Ed. Text Revision 2000), includes the scale that is primarily used by mental health practitioners. The GAF Scale is used to report "the clinician's judgment of the individual's overall level of functioning" (with regard to only psychological, social, and occupational functioning) and "may be particularly useful in tracking the clinical progress of individuals in global terms, using a single measure." *See* DSM-IV-TR 32-34. The GAF scale is divided into 10 ranges of functioning, each with a 10-point range in the GAF scale. *Id. See* Nichols v. Astrue, Case No. 3:11cv409/LC/CJK, 2012 U.S. Dist. LEXIS 119347, at *26-29 (N.D. Fla. Aug. 7, 2012) (discussing GAF scale). A GAF scale rating of 21-30 indicates behaviors considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas. DSM-IV-TR 34. A GAF scale rating of 31-40 is indicative of some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. *Id.* A GAF scale rating of 41-50 is indicative of serious symptoms or any serious impairment in social, occupational or school functioning. *Id.* A GAF scale rating of 51 to 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.* A GAF scale rating of 61-70 is indicative of

On November 19, 2012, Plaintiff was hospitalized for increase in his mental symptoms as he reported depression and feelings of hopelessness. Tr. 658.  He was casually dressed, cooperative, his speech and psychomotor activity were within normal limits; he was positive for anxious mood and depressed affect; he had logical thought process and relevant thought content, no perceptual disturbances; he was oriented to person, and time, although he admitted suicidal ideation, he denied homicidal ideation.  His judgment was intact and intelligence average although his insight was poor.  His immediate digit span (seven out of seven), recent recall (three out of three), and remote memory (three) appeared to be normal.  His strengths included general fund of knowledge and motivation for treatment/growth.  Tr. 662-64.  He was assigned a GAF score of 25.

---

some mild symptoms or some difficulty in social, occupational or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships.  *Id.* The "Commissioner has declined to endorse the GAF scale for 'use in the Social Security and SSI disability programs' and has indicated that GAF scores have no 'direct correlation to the severity requirements of the mental disorders listings.'"  Wind v. Barnhart, 133 F. App'x 684, 692 n.5 (11th Cir. 2005) (citing 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000)).  In the Fifth Edition of the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) (5th ed. 2013), "[i]t was recommended that the GAF be dropped from DSM-5 for several reasons, including its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice.  In order to provide a global measure of disability, the WHO Disability Assessment Schedule (WHODAS) is included, for further study, in Section III of DSM-5 (see the chapter "Assessment Measures")."  DSM-5 at 16; *see* Finley v. Colvin, No. 3:12-7908, 2013 WL 6384355, at *23 n.9 (S.D. W.Va. Dec. 5, 2013) ("It should be noted that in the latest edition of the [DSM], the GAF scale was abandoned as a measurement tool.").

Tr. 664.  He was discharged on December 1, 2012, with a GAF score of 60.

Tr. 655-57.  The examining psychiatrist noted Plaintiff presented as

paranoia, stating he felt as if others were controlling him and admitted

having urges to harm others.  Tr. 656.  Plaintiff was positive for a flat affect

and minimal staff/peer interactions during group therapy treating with a

social worker who completed a psychosocial assessment.  *Id.*

On December 6, 2012, Plaintiff sought treatment at an ER at Pinnacle

Health for symptoms of depression and suicidal ideations.  Tr. 525.  It was

noted Plaintiff was having thoughts to overdose on his medications or to

jump in front of traffic; he was recently kicked out of a homeless shelter for

failing a drug test, but his drug screen in the ER was negative; he reported

homicidal ideations against the security guards at the homeless shelter.

Tr. 481.  Plaintiff was somewhat irritable but cooperative during the

evaluation.  *Id.*  He was diagnosed with schizoaffective disorder, bipolar

type by history and assigned a GAF score of 27 at the initial psychiatric

evaluation, Tr. 483, and received the same diagnosis (adding "most recent

episode depressed"), but a GAF score of 61 on discharge, Tr. 475.

On March 3, 2013, Plaintiff was admitted in the ER at Pinnacle Health

for an increase in his mental symptoms.  Tr. 512, 514.  He reported being

compliant with his medication and, upon examination, he was positive for a

depressed mood and flat affect, as well as positive for auditory

hallucinations (hearing voices giving commands) and suicidal ideations.  *Id.*

A review of systems, under psychiatric, states: "Historian reports

hallucinations, suicidal ideations."  Tr. 512.  Under physical examination,

psychiatric, it is stated: "Psychiatric exam included findings of patient

oriented to person place and time, Affect, flat."  Tr. 513.

The ALJ refers to Dr. Chosson's examination and evaluation of

Plaintiff.  Tr. 21.

> On May 2, 2013, the claimant presented for a consultative examination with Dawn Crosson, Psy.D., at the request of Disability Determinations.  Therein, the claimant confided a history of childhood neglect and abuse.  The claimant reported a history of depression, isolation, multiple suicide attempts, and numerous inpatient hospitalizations.  The claimant endorsed psychotic symptoms, such as distrustfulness, paranoia, and command hallucinations.  The claimant noted that he attended outpatient treatment at T.W. Ponessa until January 2013 when he was discharged due to absenteeism (Exhibit 6F) [Tr. 541-44].

> On mental status examination, the claimant was neatly and appropriately dressed.  The claimant had good eye contact and rapport was established.  His mood and affect appeared within normal limits.  He reported that he was worried and depressed about his appointment.  The claimant's rate of speech was normal.  There was no evidence of a speech impairment.  The claimant was able to maintain the topic of conversation.  The claimant reported a history of auditory and visual hallucinations. He reported suicidal ideations the morning prior to the evaluation. He contracted with the evaluator not to harm himself He denied homicidal ideation but noted rage towards others that he often deflects back to himself.   The claimant's abstract thinking appeared  adequate.  The claimant's insight appeared fair.  He

recognized that his thoughts and the voices are irrational. The claimant reported that he thinks most about" his mom and great grandmother". His mother died two years ago and his great grandmother passed away several years prior. The claimant's memory appeared to be fair. He was able to recall past events but relayed that he is forgetful. The claimant appeared to be a reasonable historian. The mental status examination was relatively unremarkable considering the claimant's alleged mental symptomology.

However, in her report, Dr. Crosson noted:

> Mr. Johnson is an African-American male that struggles with mood regulation and psychotic symptoms. He is sad on most occasions. He lacks energy and motivation. He [is] withdrawn and isolates himself from others without completing hygiene tasks. Mr. Johnson has visual and auditory hallucinations that command him to harm himself and others. He is paranoid and distrustful and feels that others are against him. His thinking is disorganized and disoriented. He has psychotic symptoms in the absence of depression. The DSM-IV diagnosis of Schizoaffective Disorder, Depressed Type is offered. Exhibit 6F/6 [Tr. 543].

In terms of prognosis, Dr. Crosson noted that psychotic disorders are cyclic and maintenance is often difficult. The claimant was assigned a GAF of 38 (Exhibit 6F/7) [Tr. 544], indicating some impairment in reality testing or communication. Dr. Crosson opined, "Mr. Johnson is unable to sustain attention, concentration or pace to satisfactorily perform in an 8 hour work day/40 hours per work week given his symptoms" (Exhibit 6F/7) [Tr. 544]. She also indicated that the claimant has a marked limitation in the ability to interact appropriately with the public, supervisors, and coworkers, and the claimant has an extreme limitation in the ability to respond appropriately to usual work situations and to changes in a routine work setting (Exhibit 6F/2) [Tr. 539].

The medical opinion of Dr. Crosson is given little weight, as there is a concern that she relied too heavily on the claimant's subjective report of his symptoms and limitations, uncritically

accepting as true most, if not all, of what the claimant reported. However, as noted above, the mental status examination was relatively unremarkable considering the claimant's alleged mental symptomology.  In addition, on multiple occasions, the claimant has been cooperative, and he has had an appropriate mood and affect as well as normal judgment (Exhibits 14F/3, 14F/13, 14F/22, and 22F/16) [Tr. 676 (Sept. 17, 2014), 686 (Aug. 17, 2014), 695 (July 31, 2014), 874 (Aug. 22, 2016)].

Tr. 21-22.

On May 15, 2013, Plaintiff presented to Pinnacle Health for evaluation of suicidal ideation.  Tr. 499; *see* Tr. 22.  He reported a history of schizoaffective and bipolar disorder and that he was not taking his medication and had binged on drugs -- cocaine and heroin.  *Id.*  He denied hallucinations and homicidal ideation but reported suicidal ideation.  *Id.* Under nursing assessment, psych/social and as part of a suicide risk assessment tool, it is noted, in part, that Plaintiff was a high risk for his mental state with severe depression, command hallucinations, preoccupied with hopelessness, despair, and feelings of worthlessness.  Tr. 501.  He had moderate risks in other areas, *id.*, low risk – reflective practice, *id.* at 502, and high suicide risk, *id.*

On September 23, 2013, Plaintiff received a psychological evaluation while hospitalized at Capital Health for a different physical issue.  Tr. 755-56.  The consulting psychologist diagnosed Plaintiff with schizoaffective disorder and assigned him a GAF score 45.  Tr. 755.

On September 4, 2013, Plaintiff underwent an anterior cervical

discectomy and fusion due to herniated disc at C3-C4 with cord

compression and myelopathy.  Plaintiff experienced a complication from

the surgical intervention, however, the complication resolved with

treatment.  Tr. 24; *see* Tr. 596-98, 735-46.

On February 25, 2014, Plaintiff presented for a consultative

examination with Paul Di Lorenzo, M.D., at the request of Disability

Determinations.  Tr. 24; *see* Tr. 644-47.  The ALJ provided the following.

> In February 2014, the claimant presented for a consultative
> examination with Paul Lorenzo, M.D., at the request of Disability
> Determinations.  Therein, the claimant walked with a cane for
> balance.  He was pleasant and conversational during the
> examination; however, he was noted to have poor hygiene and his
> clothes were discolored from dirt.  The claimant stated that he was
> doing some work around the house and woke up with neck pain
> and arm numbness.  He underwent a right anterior cervical fusion
> from C3-C4 and experienced a post-operative wound infection.
> The claimant endorsed mild dysphagia and difficulty swallowing;
> however, he also noted that the symptoms were resolving.  The
> claimant noted that he only takes two medications, Seroquel and
> Singular (Exhibit 10F) [Tr. 644-45].
>
> The orthopedic and neurological examination was unremarkable.
> In his report, Dr. Lorenzo states:
>
> > The claimant walks with a normal non antalgic gait, holding
> > the cane in the air for which he barely touches the ground.
> > The cane is too large for the claimant. When in the exam
> > room, the claimant  has a no physiologic  tremor  in the upper
> > and lower extremities  while walking that seems to be
> > exacerbated  with the use of a cane and  without the use of

the cane, it disappears. He states he needs it for balance, however taking the cane away, his standing balance is normal. There is no dysmetria in the upper extremities. Exhibit 10F/2 [Tr. 644].

His cervical range of motion is normal. There is no increase in tone in the upper or lower extremities. His reflexes are normal. His cervical range of motion is normal. Range of motion of the shoulders, elbows, wrists, and digits are normal. His grip and grasp are normal. His prehensile patterns are preserved. Patient's lumbosacral flexion is normal. There is no paravertebral pain or sciatic notch pain. His straight leg raising is negative to 90 degrees in sitting and lying position. Range of motion of the hips, knees, and ankles are normal. There is no increase in tone or pathological reflexes. There is no discrete sensory disturbances. Vascular status is normal. There is no swelling or edema or Homans sign. Exhibit 10F/2-3 [Tr. 644-45].

Dr. Lorenzo further noted, "In my opinion, there is a no physiologic tremor that is intermittent and not related to any neurologic or orthopedic abnormality" (Exhibit 10F/3) [Tr. 645]. This opinion is given great weight as the consultative examiner had an opportunity to personally examine the claimant and the examination is consistent with the medical evidence of record.

Tr. 24-25.

On March 20, 2014, Plaintiff presented for a consultative examination

with Dr. Karpf at the request of Disability Determinations. Tr. 23; *see*

Tr. 649-53 (Exhibit 11F). The ALJ provided an extensive discussion of

Dr. Karpf's evaluation.

Therein, the claimant stated that he has been in a drug and alcohol rehabilitation program twice. Once in 2010 and once in 2013, both for abusing heroin. The claimant stated that he has

been off heroin for more than a year.  The claimant stated that his longest job was at a fast food restaurant for seven months.  The claimant noted that he had trouble getting along with bosses and fellow workers (Exhibit 11F) [Tr. 650].

On mental status examination, the claimant was oriented to time, place, and person.  Appearance and grooming were appropriate for age and occasion.  The patient had staring eye contact.  Psychomotor activity was normal.  Attitude was cooperative.  Affect showed flatness with diminished intensity.  Affect was not appropriate to content of thought.  There were no involuntary movements.  Stream of conversation showed diminished spontaneity but normal volume and rate.  Speech was goal directed and there was no presence of a thought disorder in the interview.  Tangentiality was not present.  The patient's mood was "up and down."  The patient endorsed suicidal ideation.  He endorsed command hallucinations, visual hallucinations, paranoia, and anxiety (Exhibit 11F) [Tr. 651-52].

The claimant's long-term memory was below average, as measured by how he gave his history.  The claimant was able to remember two of three words after three minutes, indicating only a mild impairment with short-term working memory.  The claimant had mild to moderate impairment with immediate retention and recall.  The claimant was able to concentrate well enough to count serial 3's backwards, but could not count serial 7's backwards.  The consultative examiner noted that the claimant's social judgment is impaired by his psychosis, and there will be times when he will act in an inappropriate manner (Exhibit 11F) [Tr. 651-52].

Following the examination, the diagnostic impression was Schizoaffective Disorder Bipolar Type and Opioid Use Disorder, moderate, in remission.  In his report, Dr. Karpf noted, "The patient's emotional problems could go into partial remission only if he gets intensive psychotherapy and psychiatric monitoring of his medication.  The severity of his emotional problems is severe and he has psychotic features.  Any social and occupational limitations the patient has are due more to mental status than physical status." (Exhibit 11F/5) [Tr. 652].

The medical opinion of Dr. Karpf has been given little weight, as the doctor's opinion appears to be based *in part* on the claimant's subjective report of his symptoms and limitations (including psychotic symptoms); however, as will be discussed, the psychotic symptoms are not consistent throughout the record. Accordingly, the doctor's opinion is found to be less persuasive.

No psychosis was evident even when the claimant was noncompliant with medication in November 2014 (Exhibit 17F/4-9) [Tr. 711-16]. On November 8, 2014, the claimant presented to Capital Health Medical Center noting that he had not had his medications since July (Exhibit 17F/4) [Tr. 709, 711]. The claimant noted that he last used alcohol and cocaine one day prior (Exhibit 17F/5) [Tr. 712]. On mental status examination, the claimant was disheveled; however, body behavior was relaxed with no tremors. His facial expression was appropriate. Speech was normal. Mood was defensive. Affect was appropriate. Attitude was realistic. Concentration was normal. Thought processes were normal with no delusions or hallucinations. Judgment was impaired and insight was partial (Exhibit 17F/8) [Tr. 715]. No psychosis was evident (Exhibit 17F/9) [Tr. 716]. The claimant denied suicidal ideation and he was referred to outpatient services (Exhibit 17F/8).

What is more, on multiple occasions, the claimant has been cooperative, and he has had an appropriate mood and affect as well as normal judgment (Exhibits 14F/3, 14F/13, 14F/22, and 22F/16) [Tr. 676 (Sept. 17, 2014), 686 (Aug. 17, 2014), 695 (July 31, 2014), 874 (Aug. 22, 2016)].

Tr. 23-24 (emphasis added).

On March 3, 2015, the claimant was admitted to Lourdes Medical Center Burlington County short-term care facility on a voluntary status. The claimant's chief complaint at the time of admission, "I was feeling depressed and suicidal" (Exhibit 18F/12) [Tr. 801]. The claimant reported opiate abuse and occasional use of cocaine. A urine drug screen was positive for both substances. The claimant stated that he was not on any medications prior to

the admission.  The claimant endorsed feeling helpless, hopeless, lack of energy, no motivation, and an inability to contract for safety.  Psychiatric hospitalization was recommended (Exhibit 18F/12).  The claimant reported that he has odd jobs (cleaning up yards, painting, and other jobs).  The claimant reported that he is spending a significant proportion of the money that he makes on drugs.  The claimant noted that he spends $60 per week on heroin (Exhibit 18F/13) [Tr. 802].  On mental status examination, the claimant denied auditory or visual hallucinations.  He denied ideas of reference or persecutory delusion (Exhibit 18F/13).

Tr. 24.

After reviewing the relevant evidence, including the medical evidence

and Plaintiff's pre-hearing and hearing statements, the ALJ provided the

following conclusions.

Although the record confirms the existence of the claimant's impairments, the record does not support a resulting inability to work.  Overall, the undersigned finds that the claimant's assertions are not consistent with the medical evidence of record and other evidence in the record.  The medical evidence of record indicates that the claimant has received conservative treatment for his medical and psychiatric complaints, and he has had a good response to treatment and prescription medication when taken as prescribed (Exhibit 22F) [Tr. 873, 882].

The claimant's activities of daily living are not as limited as one would expect given his complaints.  The claimant has been able to perform odd jobs (cleaning up yards and painting, for example) (Exhibit 18F) [Tr. 801-02].  At the hearing, the claimant testified that he completed paperwork for unemployment and he has looked for work.  The claimant denied side effects from medication.  The claimant testified that he is able to sweep the floor, wash the dishes, and help with the recycling.  The claimant testified that his hobbies including reading, noting that he reads the Bible.  Prior to moving to Florida in June 2016, the claimant

would go to the grocery store one to two times per week for soda and chips (per testimony).

As for the other opinion evidence, the undersigned has considered the opinions of the State agency psychological consultants who reviewed the record initially and on (Exhibit 1A [Tr. 69-86] and 4A) [Tr. 97-111]. The doctors' opinions have been accorded some weight, as the doctors are disability specialists who reviewed the evidence of record and considered all of the objective facts at the time they rendered their opinion. However, giving the claimant some benefit of the doubt, the undersigned has included additional limitations to the residual functional capacity assessment as described above.

The undersigned has considered the opinions of the State agency medical consultants who reviewed the record initially and on reconsideration (Exhibits 1A and 4A). The undersigned gives these opinions great weight to the extent they are consistent with the assessed residual functional capacity. However, to the extent that these opinions contain greater or additional restrictions than the assessed residual functional capacity, the undersigned gives them little weight, as those restrictions are not consistent with the medical evidence of record or supported by the record as a whole. For example, a 4-hour limitation with standing and/or walking is not supported by the medical evidence of record. An orthopedic and neurologic examination was unremarkable in February 2014 (Exhibit 10F). Regular exercise has been recommended (Exhibit 22F/5 [Tr. 863]). In March 2015, the claimant reported that he is doing side jobs, primarily cleaning yards and painting (Exhibit 18F/13). On examination in August 2016, there was no clubbing, cyanosis, edema or deformity noted in the extremities. There were no focal neurological deficits noted. The claimant was in no acute distress (Exhibit 22F/16) [Tr. 874].

The [GAF] scores in the medical evidence of record have been given some weight; however, the undersigned acknowledges that a GAF score is of limited use in assessing the severity of a mental impairment. GAF scores represent a clinician's judgment about the severity of an individual's symptoms or level of mental

functioning at a particular moment in time, much like a snapshot. They do not provide a reliable longitudinal picture of the claimant's mental functioning [*see supra* at 13 n.6].

The above residual functional capacity assessment is supported by the level of care the claimant has received and the results of diagnostic testing, clinical findings, and fairly benign neurological and musculoskeletal assessments and examinations of record as detailed above.

The record does not establish that a hand-held assistive device is medically required pursuant to SSR 96-9p. To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information).

There are references to the claimant's polysubstance abuse in the medical evidence of record. However, since it is determined that the claimant is not disabled, the issue whether drug abuse and alcoholism (DA&A) is "material" to the disability, need not be addressed.

Tr. 25-26.

### III.

In evaluating Plaintiff's RFC, *see supra* at 8 n.4, the ALJ evaluated the opinions of Drs. Crosson and Karpf and provided reasons for giving little weight to their opinions regarding Plaintiff's mental capabilities. Tr. 21-23. Drs. Crosson and Karpf each provided evaluations after examining Plaintiff one time on May 2, 2013, and March 20, 2014, respectively. Tr. 538-44, 649-53.

Generally, the opinions of one-time examiners, who are non-treating doctors, are not entitled to deference or special consideration.  *See* Crawford v. Comm'r of Soc. Sec., 360 F.3d 1155, 1160 (11th Cir. 2004).  In addition, an ALJ need not give good reasons for the weight he assigns opinions from doctors who examined, but did not treat the claimant.  *See* Denomme v. Comm'r of Soc. Sec. Admin., 518 F. App'x 875, 877-78 (11th Cir. 2013) (unpublished) (citing McSwain v. Bowen, 814 F.2d 617, 619 (11th Cir. 1987); *see also* 20 C.F.R. § 416.927(c)(2) (requiring ALJs to provide "good reasons" for the weight assigned to opinions from treating acceptable medical sources).  In the end, the ALJ may reject the opinion of any physician if the evidence supports a contrary conclusion.  Sryock v. Heckler, 764 F.2d 834, 835 (11th Cir. 1985).

Conversely, although not given the same controlling weight or deference as the opinion of treating physicians, the findings of a state agency medical consultant regarding the nature and severity of a claimant's impairments must be treated as expert opinion at the ALJ and Appeals Council levels of administrative review.  *See* SSR 96-6p, 1996 SSR LEXIS 3, at *4 (July 2, 1996) (rescinded and replaced by SSR 17-2p, eff. Mar. 27, 2017).  The findings of State agency medical consultant may provide

additional evidence to support the ALJ's findings.  *See* <u>Jones v. Bowen</u>,

810 F.2d 1001, 1005 (11th Cir. 1986).

> The ALJ gave "little weight" to Dr. Chosson's opinions because

> she relied too heavily on the claimant's subjective report of his
> symptoms and limitations, uncritically accepting as true most, if not
> all, of what the claimant reported.  However, as noted above, the
> mental status examination was relatively unremarkable considering
> the claimant's alleged mental symptomology.  In addition, on multiple
> occasions, the claimant has been cooperative, and he has had an
> appropriate mood and affect as well as normal judgment.  (Exhibits
> 14F/3, 14F/13, 14F/22, and 22F/16) [Tr. 676 (Sept. 17, 2014), 686
> (Aug. 17, 2014), 695 (July 31, 2014), 874 (Aug. 22, 2016)].

Tr. 22.[7]  As for Dr. Karpf, the ALJ also gave his opinions

> little weight as the doctor's opinion appears to be based *in part* on the
> claimant's subjective report of his symptoms and limitations (including
> psychotic symptoms); however, as will be discussed, the psychotic
> symptoms are not consistent throughout the record.  Accordingly, the
> doctor's opinion is found to be less persuasive.

Tr. 23 (emphasis added).  Immediately thereafter, the ALJ discussed

relevant medical evidence relating to Plaintiff's psychosis.  Tr. 23-24; *see*

*supra* at 21-22 for the ALJ's analysis of this issue.

> As the finder of fact, the ALJ is charged with the duty to evaluate all

the medical opinions of the record and resolve conflicts that might appear.

---

[7]  *See* <u>D'Andrea v. Comm'r of Soc. Sec. Admin.</u>, 389 F. App'x 944, 948 (11th Cir.
2010) (unpublished) (rejecting the claimant's argument "that the ALJ erred in failing to
accord appropriate weight to the opinion of her treating physician . . . because the ALJ
articulated at least one specific reason for disregarding the opinion and the record
supports it").  Here, the ALJ gave more than one reason for giving little weight to the
consultant doctors' opinions.

20 C.F.R. § 416.927.[8]  When considering medical opinions, the following

factors apply for determining the weight to give to any medical opinion: (1)

the frequency of examination and the length, nature, extent of the treatment

relationship; (2) the evidence in support of the opinion, such as "[t]he more

a medical source presents relevant evidence to support an opinion,

particularly medical signs and laboratory findings, the more weight" that

opinion is given; (3) the opinion's consistency with the record as a whole;

(4) whether the opinion is from a specialist and, if it is, it will be accorded

greater weight; and (5) other relevant but unspecified factors.  20 C.F.R.

§ 416.927(b) & (c)(1)-(6).

    Plaintiff does not quarrel with the ALJ's consideration of the opinions

of any treating physicians or other medical sources, except the opinions of

Drs. Crosson and Karpf.  *See* ECF No. 17 at 13-23; *but see* ECF No. 17 at

19, Plaintiff questioning ALJ's citation to "treatment records from non-

mental health providers."

    The general rule that the opinion of the claimant's treating physician

must be accorded considerable weight by the Commissioner unless good

---

[8]  This provision applies to claims filed before March 27, 2017.  For claims filed
after that date, section 416.920c, titled "How we consider and articulate medical
opinions and prior administrative medical findings for claims filed on or after March 27,
2017," applies.

cause is shown to the contrary, is not applicable here.  *See* Lewis v.

Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997); *see also* 20 C.F.R.

§ 416.927(c)(1)-(6) (factors to be considered).  Further, opinions on some

issues, such as whether the claimant is unable to work, the claimant's RFC,

and the application of vocational factors, "are not medical opinions, . . . but

are, instead, opinions on issues reserved to the Commissioner because

they are administrative findings that are dispositive of the case; i.e., that

would direct the determination or decision of disability."  20 C.F.R.

§ 416.927(d); *see* Bell v. Bowen, 796 F.2d 1350, 1353-54 (11th Cir. 1986).

"[T]reating source opinions on issues reserved to the Commissioner are

never entitled to controlling weight or special significance."  SSR 96-5p,

1996 SSR LEXIS 2, at *6 (July 2, 1996) (rescinded eff. Mar. 27, 2017).

Although physician's opinions about what a claimant can still do or the

claimant's restrictions are relevant evidence, such opinions are not

determinative because the ALJ has responsibility of assessing the

claimant's RFC.  *See supra* at 8 n.4.

Nevertheless, in general, the opinions of examining physicians are

given more weight than non-examining physicians, 20 C.F.R.

§ 416.927(c)(1)-(2), and the ALJ must state with particularity the weight

given to different medical opinions and the reasons therefor.  Winschel v.

Comm'r of Soc. Sec., 631 F.3d 1176, 1179 (11th Cir. 2011) (citing Sharfarz
v. Bowen, 825 F.2d 278, 279 (11th Cir. 1987) (per curiam). "In the absence
of such a statement, it is impossible for a reviewing court to determine
whether the ultimate decision on the merits of the claimant's rational and
supported by substantial evidence." Cowart v. Schweiker, 662 F.2d 731,
735 (11th Cir. 1981). "Therefore, when the ALJ fails to state with at least
some measure of clarity the grounds for his decision, we will decline to
affirm simply because some rationale might have supported the ALJ's
conclusion." Winschel, 631 F.3d at 1179 (quoting Owens v. Heckler, 748
F.2d 1511, 1516 (11th Cir. 1984) (internal quotation marks omitted)).

Following her examination of Plaintiff on May 2, 2013, on May 28,
2013, Dr. Crosson opined that Plaintiff has marked limitation in the ability to
interact appropriately with the public, supervisors, and coworkers and an
extreme limitation in the ability to respond appropriately to usual work
situations and to changes in a routine work setting. Tr. 539. Regarding the
"effect of impairment on functioning," Dr. Crosson also stated, in part, that
Plaintiff "is unable to sustain attention, concentration or pace to
satisfactorily perform in an 8 hour work day/40 hours per work week given
his symptoms." Tr. 544.

On March 20, 2014, Dr. Karpf opined Plaintiff had mild to moderate impairment with immediate attention and recall, some difficulty controlling anger, impaired social judgment, poor judgment, poor abstract reasoning, and severe emotional problems.  Tr. 652.  He further stated that any social and occupational limitations are due more to mental status than physical status.  *Id.*

Neither consultant explained how the fairly unremarkable objective findings during both consultative examinations support the significant limitations they noted in their opinions.  For example, Dr. Crosson's examination indicated Plaintiff presented neatly and appropriately dressed, with good eye contact and established report.  Tr. 21, 543.  Despite reporting he was worried and depressed, his mood and affect appeared within normal limits.  *Id.*  Rate of speech was normal and he was able to maintain the topic of conversation.  Tr. 21-22, 543.  His abstract thinking appeared adequate and he was able to conceptualize the statement "no use crying over spilled milk."  Tr. 22, 543.  Although he reported that he is forgetful, he was able to recall past events.  *Id.*  Although Plaintiff argues "Dr. Crosson had access and reviewed Plaintiff's mental health records of and to that date," her report specifies that she reviewed a November 2012 discharge summary from T. W. Ponessa and noted his attendance as an

outpatient at T. W. Ponessa until January 2013 when he was discharged due to absenteeism.  Tr. 542; *see* ECF No. 17 at 17.  It does not appear Dr. Crosson based her opinion on a review of Plaintiff's complete medical record as it existed at that time.

Plaintiff presented to Dr. Karpf with appropriate grooming and appearance, normal psychomotor activity, and cooperative attitude. Tr. 651.  Although stream of conversation showed diminished spontaneity, rate and volume were normal, speech was goal directed, there was no presence of a thought disorder in the interview, and tangentiality was not present.  Tr. 22, 651.  He was oriented to time, place, and person.  *Id.* Testing showed mild impairment with short-term working memory, as Plaintiff was able to recall two or three words after a short delay.  Tr. 22, 652.  Plaintiff's concentration was sufficient to count serial 3's backwards, but not serial 7's, and he had mild to moderate impairment with immediate retention and recall, as he could remember five out of six digits forward and three out of six digits backwards.[9]  *Id.*  Dr. Karpf noted that although Plaintiff reported problems comprehending and following instructions, "he

---

[9]  During an initial psychiatric evaluation at Fairmont on November 19, 2012, *see supra* at 14, Plaintiff's memory, immediate digit span, was seven out of seven and memory, recent recall, was three out of three.  Tr. 663.

did not manifest any of this in the interview" and, in the interview, he could focus on the topic of conversation without difficulty.  Tr. 651.

Further, the ALJ noted that both opinions were also without support from the other evidence of record.  Tr. 22-24.  Records of the other medical professionals who examined and treated Plaintiff did not include objective medical findings or other evidence indicating that he was as limited as Drs. Crosson and Karpf opined.  *Id.*  For example, the ALJ noted "on multiple occasions, the claimant has been cooperative, and he has had an appropriate mood and affect as well as normal judgment (Exhibits 14F/3, 14F/13, 14F/22, and 22F/16) [Tr. 676, 686, 695, 874]."  Tr. 22, 24.  The ALJ also noted that when Plaintiff presented to Capital Health Medical Center (Capital Health in Trenton, New Jersey) in November 2014, no psychosis was evident even when he was noncompliant with medication and had used alcohol and cocaine one day prior.  Tr. 23; *see* Tr. 711-16 (Exhibit 17F at 4-9).  Although he was disheveled and had defensive mood, his body behavior was relaxed with no tremors, he had appropriate facial expression, normal speech, appropriate affect, realistic attitude, normal concentration and thought processes with no delusions or hallucinations.  Tr. 22-23, 711-16.  The ALJ also noted Plaintiff has had a good response to treatment and prescription medication when taken as prescribed.  Tr. 25,

307, 476, 873; *see* 20 C.F. R. §§ 416.927(c)(4), 416.929(c)(3); Dyer v. Barnhart, 395 F.3d 1206, 1212 (11th Cir. 2005).

The ALJ may consider a claimant's daily activities when evaluating subjective complaints of disabling pain and other symptoms. Macia v. Bowen, 829 F.2d 1009, 1012 (11th Cir. 1987); 20 C.F.R. § 416.929(c)(3)(i). *But see* Lewis v. Callahan, 125 F.3d at 1441 ("participation in everyday activities of short duration, such as housework or fishing" does not disqualify a claimant from disability). Here, the ALJ considered Plaintiff's activities of daily living, which further supported the ALJ's assessment of the consultant's opinions. Tr. 18-19, 21, 25.

When the entire record is reviewed, it becomes apparent that the ALJ did not find Plaintiff's explanation of his ability to work persuasive based on a review of the medical evidence and other evidence of record. *See, e.g.*, Tr. 25. Plaintiff does not contend the ALJ gave passing reference to the consultant's opinions, only that he impermissibly characterized, e.g., Dr. Karpf's opinion to "be based *in part* on the claimant's subjective report of his symptoms and limitations (including psychotic symptoms)," although noting that "the psychotic symptoms are not consistent throughout the record" and, found his opinion "to be less persuasive." Tr. 23 (emphasis added). Likewise, the ALJ gave "little weight" to the medical opinion of

Dr. Crosson, expressing "a concern that she relied too heavily on the claimant's subjective report of the symptoms of limitations, uncritically accepting as true most, if not all, of what the claimant reported" and further noted that the mental status examination was relatively unremarkable considering Plaintiff's alleged mental symptomology.  Tr. 22.  In support, the ALJ further noted that "on multiple occasions, the claimant has been cooperative, and he has had an appropriate mood and affect as well as normal judgment (Exhibits 14F/3, 14F/13, 14F/22, and 22F/16) [Tr. 676 (Sept. 17, 2014), 686 (Aug. 17, 2014), 695 (July 31, 2014), 874 (Aug. 22, 2016)]."  Tr. 22.

In summary, substantial evidence supports the ALJ's determination that Drs. Crosson and Karpf's opinions were inconsistent with the record as a whole.  *See* 20 C.F.R. § 416.927(c)(4); Crawford, 363 F.3d at 1159-60; Ogranaja v. Comm'r of Soc. Sec., 186 F. App'x 848, 850-51 (11th Cir. 2006) (unpublished).  Substantial evidence also supports the ALJ's determination that Plaintiff's subjective statements were not entirely consistent with the evidence in the record.  Tr. 21-26.  Based upon a review of the entire record, substantial evidence supports the ALJ's decision to record "little weight" to the consultative examiners' opinions.

## V. Conclusion

Considering the record as a whole, the ALJ's findings are based upon substantial evidence in the record and the ALJ correctly applied the law. Accordingly, it is respectfully recommended that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **AFFIRMED** and Judgment entered for Defendant.

**IN CHAMBERS** at Tallahassee, Florida, on June 28, 2018.

s/ Charles A. Stampelos
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**Within fourteen (14) days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to these proposed findings and recommendations. Fed. R. Civ. P. 72(b)(2). A copy of the objections shall be served upon all other parties. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Fed. R. Civ. P. 72(b)(2). Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control. If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a Report and Recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. See 11th Cir. R. 3-1; 28 U.S.C. § 636.**